## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 13 2017, 9:42 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Elizabeth A. Bellin
Elkhart, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Matthew B. MacKenzie
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Diego A. Ramos,

*Appellant-Defendant*,

v.

State of Indiana,

*Appellee-Plaintiff*.

September 13, 2017

Court of Appeals Case No.
20A03-1705-CR-1036

Appeal from the Elkhart Circuit Court

The Honorable Michael A. Christofeno, Judge

Trial Court Cause No.
20C01-1511-F6-1038

**Brown, Judge.**

Diego A. Ramos appeals his aggregate sentence of two and one-half years for synthetic identity deception as a level 6 felony and counterfeiting government documents as a class A misdemeanor. Ramos raises two issues which we revise and restate as:

> I. Whether the trial court erred in ordering him to pay certain fines and costs without first determining his ability to pay; and

> II. Whether his sentence is inappropriate in light of the nature of the offense and his character.

We affirm and remand.

### *Facts and Procedural History*

On or between May 1, 2015, and October 28, 2015, Ramos knowingly obtained, possessed, transferred, or used synthetic identifying information with the intent to profess to be another person named Francisco. Ramos used Francisco's documents to obtain employment and worked at that job using that false identity. On or about October 28, 2015, Ramos knowingly possessed, produced, or distributed a document not issued by a government entity that purported to be a government-issued identification. He purchased a counterfeit identification and used it while applying for a job, the name on the counterfeit identification was Francisco's name, and the document appeared to be a government-issued document from the State of Michigan.

[3] On November 3, 2015, the State charged Ramos with: Count I, synthetic identity deception as a level 6 felony;[1] and Count II, counterfeiting government documents as a class A misdemeanor.[2] On April 3, 2017, the court held a plea hearing at which Ramos pled guilty to both counts as charged pursuant to an agreement which stated that all terms of sentencing were left to the discretion of the court.

[4] On April 27, 2017, the court held a sentencing hearing at which counsel presented arguments and Ramos apologized for breaking the law and stated he was trying to earn an honest living, he was brought to the United States when he was three years old, and this was his first felony and it was not violent or drug-related. The court found that the mitigating factors included Ramos's acceptance of responsibility, he had a low score to reoffend, he had served thirteen months in jail on another case, he used some of his earnings to help support his mother, and he was planning to voluntarily accept deportation. The court found Ramos's criminal history to be an aggravating factor and noted that, although Ramos was relatively young, he had a referral and three adjudications as a juvenile and had four misdemeanor convictions. The court also stated that Ramos committed a crime every day he worked, other forms of

---

[1] Ind. Code § 35-43-5-3.8(a) provides in part that a person "who knowingly or intentionally obtains, possesses, transfers, or uses the synthetic identifying information . . . with intent to profess to be another person . . . commits synthetic identity deception, a Level 6 felony."

[2] Ind. Code § 35-43-5-2.5 provides that a person "who knowingly or intentionally possesses, produces, or distributes a document not issued by a government entity that purports to be a government issued identification commits a Class A misdemeanor."

sanction have proved unsuccessful in keeping him from engaging in criminal activity, and he had not taken advantage of programs or alternative sanctions that have been offered to him in the past. It noted that he had been ordered to pay fines and costs, was placed on probation and ordered to community service, had COWP weekends, and had his driver's licenses suspended, none of which prevented him from committing further crimes. The court also found Ramos's marijuana use since age sixteen to be an aggravator.

[5]   The court sentenced Ramos to two and one-half years on Count I and one year on Count II to be served concurrently. It ordered Ramos to pay a fine of $1,500 with $500 suspended on Count I, a fine of $1,000 suspended on Count II, the costs of the action, and to reimburse the Elkhart County Public Defender in the sum of $500, all within thirty days and stated that the clerk would assess a late payment fee if he failed to make payment by that date.

## *Discussion*

## I.

[6]   The first issue is whether the trial court erred in ordering Ramos to pay fines and costs without first determining his ability to pay. Sentencing decisions, including decisions to impose restitution and costs, are generally left to the trial court's discretion. *Berry v. State*, 950 N.E.2d 798, 799 (Ind. Ct. App. 2011). If the fees imposed by the trial court fall within the parameters provided by statute, we will not find an abuse of discretion. *Id.*

[7] Ramos maintains that the court erred in ordering him to pay fines, costs, and reimburse the public defender, that no indigency hearing or inquiry was made to determine whether he had the ability to pay his fines and costs within thirty days or at all, the court concluded he had the ability to reimburse the public defender even though he was determined to be indigent for purposes of securing counsel and remained incarcerated throughout the duration of his case, and the court exceeded the public defender fee permitted by statute.

[8] The State agrees that remand is appropriate to clarify Ramos's indigency status for purposes of ordering the payment of fines, fees, or costs. With respect to the fines, it states that the court did not conduct an indigency hearing as to Ramos's ability to pay pursuant to Ind. Code § 35-38-1-18, a court is not required to make the assessment until a defendant's sentence is completed, and remand to either hold the indigency hearing or clarify that this assessment will be made at the completion of Ramos's sentence is appropriate. As for the public defender fee, the State's position is that because the court did not conduct an indigency hearing as to his ability to pay costs, the appropriate remedy is to remand to the trial court with instructions to follow statutory requirements should it elect to impose public defender fees.

[9] Ind. Code § 35-50-2-7 provides in part that a person who commits a level 6 felony may be fined not more than $10,000, and Ind. Code § 35-50-3-2 provides that a person who commits a class A misdemeanor may be fined not more than $5,000. The Indiana Supreme Court has noted that the Indiana legislature requires indigency hearings as to the imposition of fines and costs, *see* Ind. Code

§ 33-37-2-3(a) (providing "when the court imposes costs, it shall conduct a hearing to determine whether the convicted person is indigent"); Ind. Code § 35-38-1-18 (same for court-imposed fines), and the Court has held that, "when fines or costs are imposed upon an indigent defendant, such a person may not be imprisoned for failure to pay the fines or costs."[3] *Whedon v. State*, 765 N.E.2d 1276, 1279 (Ind. 2002). The Court has also stated that "a defendant's financial resources are more appropriately determined not at the time of initial sentencing but at the conclusion of incarceration, thus allowing consideration of whether the defendant may have accumulated assets through inheritance or otherwise." *Id.* While a trial court's appointment of defense and appellate counsel for a defendant implies a finding of indigency, the appointment of counsel is not conclusive as to the defendant's inability to pay costs. *Briscoe v. State*, 783 N.E.2d 790, 792 (Ind. Ct. App. 2003). Where a trial court fails to conduct an indigency hearing when required, the proper remedy is to remand with instructions to hold such a hearing. *Id.* at 792-793.

[10] Indiana statutes also provide authority for a trial court to impose a fee on a defendant for costs of appointed representation. Ind. Code § 35-33-7-6 provides in part that, if the court finds that a person is able to pay part of the cost of representation by assigned counsel, the court shall order the person to pay a fee of one hundred dollars for a felony action or fifty dollars for a misdemeanor

---

[3] Also, Ind. Code § 33-37-2-3(b) provides in part that "[a] court may impose costs and suspend payment of all or part of the costs until the convicted person has completed all or part of the sentence" and "[i]f the court suspends payment of the costs, the court shall conduct a hearing at the time the costs are due to determine whether the convicted person is indigent."

action.  This statute contemplates that trial courts will order a defendant to pay the fee at the initial hearing, *see* Ind. Code § 35-33-7-6(a), but it does not prohibit trial courts from imposing the fee at other stages of the proceedings. *Davis v. State*, 843 N.E.2d 65, 68 (Ind. Ct. App. 2006).  Ind. Code § 33-37-2-3(e) provides that if after an indigency hearing "the court determines that a convicted person is able to pay part of the costs of representation, the court shall order the person to pay an amount of not more than the cost of the defense services rendered on behalf of the person."

[11]    Although trial and appellate counsel may have been appointed to represent Ramos and the presentence investigation report (the "PSI") indicates he listed no assets, these facts are not conclusive as to his ability to pay fees or part of the costs of representation by assigned counsel, and the trial court erred in failing to hold a hearing or make the necessary inquiry regarding his indigency or ability to pay as statutorily required.  Further, the court ordered that Ramos pay all fines, costs, and fees within thirty days without making an inquiry regarding whether he had the ability to pay at that time.  We remand with instructions to hold a hearing on Ramos's indigency or ability to pay.  *See Briscoe*, 783 N.E.2d at 793 (noting that the appointment of trial and appellate counsel implied the trial court knew of the defendant's indigency and that the presentence investigation report provided some information regarding the defendant's financial position, noting that these facts were not conclusive as to the defendant's ability to pay fees, holding the trial court erred when it failed to conduct a hearing on this issue, and remanding with instructions to hold a

hearing on the defendant's indigency because his sentence included the imposition of a fee).[4]

## II.

[12] The next issue is whether Ramos's sentence is inappropriate in light of the nature of the offense and his character. Ind. Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[13] Ramos argues that his sentence was inappropriate and that there was nothing notably distinguishable based on the nature of his non-violent offense as a level 6 felony to justify a maximum sentence. He argues that he entered the United States at the age of three and did not enter the country by choice, he admitted to his crime, his risk assessment score placed him in the low risk to reoffend category, and his illegal status was tempered by his acceptance of responsibility. The State responds that Ramos's sentence is appropriate in light of his character

---

[4] In *Briscoe*, we also noted the Court's statement in *Whedon* that a "a defendant's financial resources are more appropriately determined not at the time of initial sentencing but at the conclusion of incarceration," *Briscoe*, 783 N.E.2d at 793 (citing *Whedon*, 765 N.E.2d at 1279), and then noted that, "[w]hile this may be interpreted to suggest that hearings subsequent to sentencing should be held to determine a defendant's indigency, *Whedon* did not suggest a procedure for doing so" and "[w]e need not reach that issue . . . because IC 35-38-1-18(a) and IC 33-19-2-3(a) clearly mandate a hearing at the time of sentencing, which was not done in this case." *Id.*

including his criminal history, failure to take advantage of numerous rehabilitative opportunities offered to him, illegal presence in the country, the fact he placed himself in a position in which he was charged with attempted murder and murder on two separate occasions, and he did not demonstrate remorse. It also argues that his sentence is appropriate in light of the nature of the offenses, that Francisco, his employer, and the States of Indiana and Michigan were victims and that his employment under false pretenses enabled him to defraud the State of Indiana of tax revenue.

[14] Our review of the nature of the offenses reveals that Ramos knowingly obtained and used synthetic identifying information with the intent to profess to be Francisco. He used Francisco's documents to obtain employment and worked at that job using that false identity. He further knowingly possessed a document not issued by a government entity that purported to be a government-issued identification. He purchased a counterfeit identification and used it while applying for a job, the name on the counterfeit identification was Francisco's name, and the document appeared to be a government-issued document from the State of Michigan.

[15] Our review of the character of the offender reveals that Ramos pled guilty approximately seventeen months after being charged and left all terms to the discretion of the trial court. The PSI shows that, as a juvenile, he had adjudications for disorderly conduct in 2009 and for possession of marijuana, hashish, hash oil and for illegal consumption of alcohol in 2010. It also states he received a referral for Never a Valid License in 2011 which was continued to

formal supervision. His adult history includes Never Obtain Valid License as a misdemeanor in February 2014 for which his license was suspended, he was later found guilty of a suspension violation and ordered to two COWP weekends, and he later pled guilty to a suspension violation and was sentenced to thirty days in jail. He was convicted of Never Obtain License With Prior Conviction as a misdemeanor in June 2014 and Never Obtain License as a misdemeanor in September of 2014. He was convicted of driving while suspended as a class A misdemeanor in July 2015 and later failed to appear in that cause. The PSI further states that Ramos was arrested for attempted murder as a class A felony and criminal gang activity as a class D felony on April 15, 2013 and was released to immigration authorities on April 24, 2013; he was arrested for battery/bodily harm as a misdemeanor in February 2016 in Cook County, Illinois, for which the disposition is unknown; and he was arrested and charged with two counts of murder in March 2016 and in February 2017 was found not guilty.

[16] With respect to his version of the present offense, Ramos reported: "I needed to work. My cousin let me use his papers to get a job. I don't have legal status. I got caught." Appellant's Appendix Volume II at 53. At sentencing, Ramos stated he was just trying to earn an honest living and apologized for breaking the law. The PSI indicates Ramos was born in 1993 in Mexico, he entered the United States without inspection in 1996, and that, while he reported no gang affiliations, according to Elkhart County Sheriff's Department records he has been labeled to have had gang affiliations. He completed the eleventh grade

and was suspended from school for fighting. He reported that he began to use marijuana at age sixteen and he last used marijuana in 2012, and completed treatment as a juvenile at Oaklawn.

[17] After due consideration, we conclude that Ramos has not sustained his burden of establishing that his concurrent sentences are inappropriate in light of the nature of the offenses and his character.

## *Conclusion*

[18] For the foregoing reasons, we affirm Ramos's sentence and remand for a determination of his indigency or ability to pay consistent with this opinion.

[19] Affirmed and remanded.

Najam, J., and Kirsch, J., concur.